# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
## STATESVILLE DIVISION
## CIVIL ACTION NO. 5:22-CV-00157-KDB-DCK

| | |
|---|---|
| SAMANTHA MAIN, | |
| **Plaintiff,** | |
| v. | **ORDER** |
| BRANDON WINGLER, B. PHIL HOWELL AND JOE FRANCIS, | |
| **Defendants.** | |

**THIS MATTER** is before the Court on Defendants' Motion for Summary Judgment (Doc. No. 15). The Court has carefully considered this motion, the parties' briefs and exhibits and oral argument on the motion from the parties' counsel on February 28, 2024.[1] In this action, Plaintiff Samantha Main asserts that Defendants are liable to her under 42 U.S.C. § 1983 and North Carolina law in connection with her arrest in October 2019.  Because the Court finds there was probable cause for her arrest and Defendants used reasonable force and/or are entitled to qualified / public official immunity for their conduct in arresting Plaintiff, the Court will **GRANT** the motion.

---

[1] The Court initially held a hearing on the motion on February 15, 2024, which Plaintiff's counsel did not attend (and at which Defendants' counsel did not offer argument). Following the hearing, the Court entered a docket entry indicating that a written order granting the motion would be issued. Following that notice, Plaintiff's counsel promptly explained his absence to the Court and the hearing was rescheduled. Neither the Court's earlier decision nor this decision to grant the motion was affected in any manner by counsel's failure to attend the first hearing.

1

# I.    LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *United States v. 8.929 Acres of Land in Arlington Cnty., Virginia*, 36 F.4th 240, 252 (4th Cir. 2022) (quoting Fed. R. Civ. P. 56(a)); *see United States, f/u/b Modern Mosaic, LTD v. Turner Construction Co*., *et al*., 946 F.3d 201, 206 (4th Cir. 2019).  A factual dispute is considered genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *8.929 Acres of Land,* 36 F.4th at 252. "A fact is material if it might affect the outcome of the suit under the governing law."  *Id*. (quoting *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013)).

The party seeking summary judgment bears the initial burden of demonstrating the absence of a genuine issue of material fact through citations to the pleadings, depositions, answers to interrogatories, admissions, or affidavits in the record. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (when the nonmoving party "has failed to make a sufficient showing on an essential element of [his] claim with respect to which [he] has the burden of proof," summary judgment is warranted); *United States ex rel. Gugenheim v. Meridian Senior Living, LLC*, 36 F.4th 173, 178 (4th Cir. 2022).  If the movant satisfies his initial burden to demonstrate "an absence of evidence to support the nonmoving party's case," the burden shifts to the nonmovant to "present specific facts showing that there is a genuine issue for trial." *8.929 Acres of Land,* 36 F.4th at 252 (quoting *Humphreys & Partners Architects, L.P. v. Lessard Design, Inc.*, 790 F.3d 532, 540 (4th Cir.

2015)). "The mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment. *Hixson v. Moran*, 1 F.4th 297, 302 (4th Cir. 2021). Rather, the nonmoving party must establish that a material fact is genuinely disputed by, *inter alia*, "citing to particular parts of the materials of record" and cannot rely only on "conclusory allegations, mere speculation, the building of one inference upon another, or the mere existence of a scintilla of evidence." Fed. R. Civ. P. 56(c)(1)(A); *8.929 Acres of Land,* 36 F.4th at 252 (quoting *Dash v. Mayweather*, 731 F.3d 303, 311 (4th Cir. 2013)).

Still, summary judgment is not intended to be a substitute for a trial of the facts. *Anderson*, 477 U.S. at 249. In determining if summary judgment is appropriate, "courts must view the evidence in the light most favorable to the nonmoving party and refrain from weigh[ing] the evidence or mak[ing] credibility determinations." *Variety Stores, Inc. v. Wal-Mart Stores, Inc.*, 888 F.3d 651, 659 (4th Cir. 2018) (internal quotation marks omitted) (quoting *Lee v. Town of Seaboard*, 863 F.3d 323, 327 (4th Cir. 2017)). "Summary judgment cannot be granted merely because the court believes that the movant will prevail if the action is tried on the merits." *Jacobs v. N.C. Admin. Office of the Courts*, 780 F.3d 562, 568-69 (4th Cir. 2015) (quoting 10A Charles Alan Wright & Arthur R. Miller et al., Federal Practice & Procedure § 2728 (3d ed.1998)).

In the end, the relevant inquiry on summary judgment is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251–52.

## II.     FACTS AND PROCEDURAL HISTORY

While the Parties disagree on some details and the characterization of their respective conduct (as discussed below), the substance of the relevant facts is not disputed. *See* Doc. Nos. 16 at 2-7; 21 at 1-6. On October 24, 2019, Plaintiff experienced a mental health episode that led her to write a suicide note, take her husband's loaded pistol and drive off in her car intending to kill herself. *See* Doc. No. 16-3 (Plaintiff's Deposition) at 22-30. As she was driving, Plaintiff reconsidered and instead called the suicide hotline. *Id*. at 30. Ultimately, after an unsuccessful visit to her counselor's house, she called her husband who urged her to come home. *Id*. at 34.

Plaintiff began driving home but got lost and contacted the Sheriff's Office non-emergency number for help. *Id*. at 34-35. The dispatcher asked Plaintiff to call her when Plaintiff made it home. *Id*. at 35. The dispatcher also notified Ashe County deputy sheriffs Joe Francis and Brandon Wingler that Plaintiff was "making threats against her life," and the two law enforcement officers proceeded towards Ms. Main's home to perform a wellness check. *See* Doc. No. 16-4 (Wingler Deposition) at 8-11. When they arrived at her home, Plaintiff was not there but the officers spoke with Plaintiff's husband who told them that Plaintiff had taken his pistol and left a suicide note, which he showed them. *Id*. at 11.

While Francis and Wingler were talking with Plaintiff's husband, Plaintiff was driving home and got behind a "slow" SUV. Doc. No. 16-3 at 36. When she was just about to approach her home, Francis and Wingler say they saw Plaintiff slow down and then "accelerate[] rapidly past her driveway." Doc. No. 16-4 at 11-12. While she disputes her rate of speed, Plaintiff admits that she saw two Sheriff's department cars in her driveway so she drove by because she "didn't

4

want to deal with them [because] I was suicidal." Doc. No. 16-3 at 36-37.  With respect to the SUV, Plaintiff says that she "got pretty close to [the SUV] wanting him to hurry up" and when she drove by her house, the SUV had to pull over on an adjoining landowner's property to let her go by. *Id.* at 51. The officers describe the events more dramatically, testifying that Plaintiff quickly took off and "ran [the SUV] off the road." Doc. No. 16-5 at 10.

In any event, there is no dispute that as soon as Plaintiff went past her house, Officers Francis and Wingler immediately turned on their lights and sirens and followed Plaintiff in their patrol cars. Doc. No. 16-4 at 12, Doc. No. 16-5 at 11, 19. The chase lasted about ten to fifteen minutes, during which the officers allege that Plaintiff was driving erratically, went left of center several times, and reached speeds of more than 70 mph. Doc. No. 16-4 at 12, Doc. No. 16-5 at 18. Although Plaintiff claimed that she did not know that Sheriff's deputies were following her (and denies driving over 55 mph), she admitted that dispatch called her during the chase and said, "They're asking you to slow your car down. Will you please slow your car down?" and she told the dispatcher that she would slow down. Doc. No. 16-3 at 39, 41-43. After Plaintiff told the dispatcher that she would slow down, Officer Francis pulled in front of her car, and Plaintiff came to a stop. Doc. No. 16-4 at 12. However, when Francis got out of his car, with his door open, Plaintiff accelerated past him, allegedly causing Francis to "jump" back in his car to avoid being hit. Doc. No. 16-4 at 13.  Plaintiff admits that she got around Officer Francis' car but has no idea how, other than that she did have to go across a double yellow line to move past the patrol car.

5

Doc. No. 16-3 at 43. From there, Plaintiff drove to her house and into her driveway, with the officers following her. Doc. No. 16-4 at 13, Doc. No. 16-3 at 53.

When Plaintiff and the officers stopped in the driveway (and before Plaintiff turned off her car), the officers quickly left their vehicles and began approaching Plaintiff's car with their guns drawn, shouting for her to "[g]et out of the vehicle, show us your hands." Doc. No. 16-4 at 13. When Plaintiff did not immediately get out, officer Wingler opened her car door (just a few seconds after exiting his vehicle)[2] and began trying to remove Plaintiff from the car. Unsurprisingly, from this point the parties describe the arrest in different terms. Plaintiff says:

> The officer approached the vehicle aggressively and forcefully and without consent was pulling at [my] arms to forcefully pull [me] out of the car even though [my] seat-belt was still fastened.
>
> [I] was stuck inside [my] vehicle because [my] seatbelt was still attached. [My] hands were out the door. While [I] was still seat-belted in [my] vehicle, the two Defendant deputies were forcefully grabbing and pulling [me] out of the front seat of [my] car, forcing [me] out of [my] seat, while [I] was still seat belted into the vehicle.
>
> [I] was in no way whatsoever resisting arrest. [I] was trying [my] best to comply with all instructions from the officers. [I] was in no way resisting, delaying, or obstructing the officers in the discharge of their duties.
>
> One Defendant deputy reached into the vehicle to unfasten [my] seatbelt and then threw [me] on the pavement. The Defendant deputy continued to holler: "Stop resisting! Stop resisting!" Defendants physically, forcefully and without consent, and with intent to injure, threw [me] to the pavement on [my] driveway, face down. [My] arm was pinned underneath [Me].

_____

[2] There is no police "body-cam" video of either the car chase or Ms. Main's arrest. However, there is video of the arrest taken by Plaintiff's home surveillance camera (with a fixed view that doesn't show all of the incident) which permits the Court an opportunity to determine the timeframe of the officers' actions and make other observations.

6

Defendant deputies forcefully rammed their knee into [my] shoulder blade, neck and back. [I] have photographs of these injuries. [I] told the Defendants that [I] could not move [my] arm, all the while the Defendant deputy kept yelling: "Stop resisting! Stop resisting!"

Defendants were asking for [my] arm and hand, but they were trapped underneath [me] by the Defendants. Defendants finally physically, forcefully, without authorization or consent, pulled out [my] arm from underneath [me]…

While [I] was pinned on the ground by the Defendants, [I] was crying and begging [my] husband, Randy Main, for help. However, there was nothing [my] husband could practically do at the time, for fear of being arrested himself. [I] have pictures of the bruises from this encounter.

Defendants then physically, forcefully and without [my] consent pulled [me] up off the ground. Id. Defendants forced [me] to their SUV vehicle and put [me] into the back of the vehicle and took me down to the station.

*See* Doc. 21 at 3-5 (citations omitted).

On the other hand, Defendants contend:

[When we were attempting to get her out of the vehicle] she was "resisting, leaning back the opposite way towards the passenger side of the vehicle." Wingler observed the 1911 handgun on the passenger seat.[3] Francis and Wingler grabbed Plaintiff's arms to prevent her from reaching for the weapon. Francis unbuckled Plaintiff's seatbelt and she was taken out of the car and, according to Plaintiff, "[t]hey throwed me on the ground."

After she was taken to the ground, Plaintiff had her hands underneath her and refused to give them her hands. Wingler pinned his knee in the back of her shoulder and Francis was yelling "Stop resisting, give me your other arm." Francis said "I'm going to get the shackles." Francis got his shackles to prevent Plaintiff from kicking and eventually the deputies "got her hands out from underneath her and handcuffed

---

[3] Notwithstanding this allegation, the video reveals that the officers did not immediately take possession of the gun after Plaintiff was handcuffed on the ground. Indeed, the officers permitted Plaintiff's husband to go into the car and turn off the engine before one of the officers later looked for and retrieved the weapon.

her. And that was the end of it." Neither Francis nor Wingler said anything else other than "[Plaintiff] could have killed a lot of people on the road or something." While Plaintiff was being arrested, she said "I should have gone ahead and done it," meaning kill herself.

Plaintiff admits that the deputies did not tase her, or punch her, but only that Wingler shoved his knee in her back. There were no apparent injuries and Plaintiff never complained of any injuries.

Doc. No. 16 at 6-7.

Plaintiff was charged with felony speeding to elude arrest, failing to heed a blue light and siren as a result of the chase, and resisting a public officer for failing to place her hands behind her back during the arrest. These charges were dismissed on June 24, 2020 because Plaintiff completed a safe driving class, substance abuse assessment, mental health counseling and because she "is currently getting the psychological help that she needs and has no further incidents with law enforcement."

This action was filed in October 2022. Plaintiff asserts seven causes of action under federal and North Carolina law against all the Defendants in both their official capacity and as individuals:

- First Cause of Action: 42 U.S.C. § 1983 violation of procedural and substantive due process rights;

- Second Cause of Action: Malicious prosecution;

- Third Cause of Action: False imprisonment and Actual imprisonment;

- Fourth Cause of Action: Intentional infliction of emotional distress;

- Fifth Cause of Action: Negligent infliction of emotional distress;

- Sixth Cause of Action: Assault; and

- Seventh Cause of Action: Battery.

*See* Doc. No. 1. Defendants have moved for summary judgment on all claims, and the motion is ripe for the Court's decision.

## III.    DISCUSSION

Plaintiff's numerous federal and state claims can best be considered within three main areas.  First, the Court will address Plaintiff's claims against the Defendants in their official capacities, as distinguished from her claims against the Defendants as individuals. Next, the Court will discuss Plaintiff's two broad allegations of unlawful conduct – false arrest and excessive force – on which all of her claims ultimately depend.

### A.    Official Capacity Claims Against the Defendants

Plaintiff has captioned her claims against the Defendants in both their "official capacity" and "individual capacity." To the extent she asserts "official capacity" claims, they fail as a matter of law. "[A] suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office." *Will v. Michigan Dept. of State Police*, 491 U.S. 58, 71 (1989). Because a state is not a "person" under § 1983, state officials acting in their official capacities cannot be sued for damages thereunder. *Gladden v. Honeycutt*, No. 5:23-CV-00121-KDB, 2023 WL 5493581, at *2 (W.D.N.C. Aug. 24, 2023). Furthermore, the Eleventh Amendment to the United States Constitution bars suits for monetary damages against the State of North Carolina and its various agencies. *See Ballenger v. Owens*, 352 F.3d 842, 844-45 (4th Cir. 2003). Also, the doctrine of sovereign immunity "shields municipalities and the officers or employees

9

thereof sued in their official capacities from suits based on torts committed while performing a governmental function." *Houpe v. City of Statesville*, 128 N.C.App. 334, 340-41, 497 S.E.2d 82, 87 (1998).[4] Defendants are therefore entitled to summary judgment on all of Plaintiff's claims against Defendants in their "official capacity."

## B.     False Arrest

Plaintiff's first Section 1983 and state common law claims against the Defendants as individuals are based on her allegation that she was "falsely" arrested. To be lawful, arrests – which are the most intrusive type of police-citizen encounter – must be supported by probable cause. *Devenpeck v. Alford*, 543 U.S. 146, 152 (2006). Therefore, with respect to claims that the Fourth Amendment has been violated by an arrest, the threshold question is whether the arrest was based on probable cause. *See Graham v. Connor*, 490 U.S. 386, 396 (1989) ("The Fourth Amendment is not violated by an arrest based on probable cause.").

Probable cause exists if the "facts and circumstances within the officer's knowledge ... are sufficient to warrant a prudent person ... in the circumstances shown, [to conclude] that the suspect has committed, is committing, or is about to commit an offense." *Michigan v. DeFillippo*, 443 U.S. 31, 37 (1979). "The validity of the arrest does not depend on whether the suspect actually

---

[4] Further, Defendants have not waived their sovereign immunity through the purchase of insurance. S*ee Estate of Earley v. Haywood County Dep't of Soc. Svcs*., 204 N.C. App. 338, 341- 43, 694 S.E.2d 405, 408-09 (2010) (no waiver of immunity where, as here, coverage is not provided for "[a]ny claim, demand, or cause of action against any Covered Person as to which the Covered Person is entitled to sovereign immunity or governmental immunity under North Carolina Law."); Doc. No. 16 at 21-23.

committed a crime; the mere fact that the suspect is later acquitted of the offense for which he is arrested is irrelevant to the validity of the arrest." *Id.* at 36.

"In assessing the existence of probable cause, courts examine the totality of the circumstances known to the officer at the time of the arrest." *Taylor v. Waters*, 81 F.3d 429, 434 (4th Cir. 1996). "Probable cause requires more than 'bare suspicion,' but requires less than evidence necessary to convict." *Porterfield v. Lott*, 156 F.3d 563, 569 (4th Cir. 1998). Reasonable law enforcement officers need not "resolve every doubt about a suspect's guilt before probable cause is established." *Torchinsky v. Siwinsky*, 942 F.2d 257, 264 (4th Cir. 1991). Probable cause is a "commonsense, nontechnical" concept that deals "with the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." *Ornelas v. United States*, 517 U.S. 690, 695 (1996) (internal citations omitted).

While the criminal charges stemming from Plaintiff's arrest have been dismissed, the Court finds that it cannot be reasonably disputed that Ms. Main's arrest was supported by probable cause. First, contrary to Plaintiff's argument, there only needs to be probable cause for one of the offenses charged. *See Wells v. Bonner*, 45 F.3d. 90, 95 (5th Cir. 1995) ("If there was probable cause for any of the charges made…then the arrest was supported by probable cause, and the claim for false arrest fails."); *Wilkerson v. Hester*, 114 F.Supp. 2d 446, 456-457 (W.D.N.C. 2000) (citing *Wells*). Indeed, as the Supreme Court has explained, probable cause only needs to exist for any offense which could have been charged, not only the ones Plaintiff was charged with after the incident. *See District of Columbia v. Wesby*, 583 U.S. 48, 54 n.2 (2018) (noting that "an arrest

Case 5:22-cv-00157-KDB-DCK   Document 24   Filed 02/29/24   Page 11 of 22

is lawful if the officer had probable cause to arrest for any offense, not just the offense cited at the time of arrest or booking"). Further, probable cause "requires only a probability or substantial chance of criminal activity, not an actual showing of such activity. Probable cause is not a high bar." *Id*. at 48, 57 (internal citations and quotations omitted).

Plaintiff was charged with failing to heed blue lights and siren in violation of N.C.G.S. § 20-157(a). In Plaintiff's affidavit, she admits facts sufficient to establish that officers Francis and Wingler[5] had probable cause probable cause for that offense: she observed defendants' cars in her driveway; a deputy was attempting to stop her vehicle; and she didn't stop for the deputy, but rather passed "the Defendant deputy…and pulled in the driveway." Doc. 21-3 at ¶¶ 16-20. Also, considering the totality of the circumstances, there can be no reasonable material dispute that 1) after Plaintiff made a conscious decision not to stop at her house, 2) the officers chased Ms. Main with their lights and sirens on for 10-15 minutes, 3) she knew they were trying to get her to stop, 4) stopped briefly only to then cross a double yellow line and start driving again and 5) finally

---

[5] There are no allegations that Sheriff Howell was personally involved with (or even had contemporaneous knowledge of) Plaintiff's arrest. This is an independent ground on which to dismiss the individual claims against him. *See Fisher v. Washington Metro. Transit Auth*., 690 F.2d 1133, 1142 (4th Cir. 1982) (upholding dismissal of claim against county sheriff where there was "no evidence that [sheriff] participated directly in any of the events of [plaintiff's] detention"). In order to establish liability under § 1983, Plaintiff must show that Sheriff Howell "acted personally in the deprivation of [her] rights." *Wright v. Collins*, 766 F.2d 841, 850 (4th Cir. 1985): *Wilcox v. Brown*, 877 F.3d. 161, 170 (4th Cir. 2017). The only allegations against Sheriff Howell are that he is the elected Sheriff, and employed Francis and Wingler. Doc. No. 1 at ¶¶ 2, 9. To the extent that Plaintiff claims that Sheriff Howell or his office did not "adequately train" the arresting officers those claims fail because, among other reasons, the Court finds that the officers did not act unlawfully or violate Plaintiff's constitutional rights as discussed throughout this order.

drove back to her driveway. These facts provide sufficient probable cause for Plaintiff's arrest, even if she disputes her speed and how she was driving. *See Ornelas v. United States*, 517 U.S. 690, 696 (1996) (When facts are admitted or established, the existence of probable cause is a question of law for the court).[6] Therefore, Defendants are entitled to summary judgment on Plaintiff's claims that depend on her allegations of a false arrest, including that portion of her Section 1983 claim and her claims for malicious prosecution and false imprisonment / actual imprisonment.

Also, even if the Court had found that the officers lacked probable cause for Plaintiff's arrest (which it does not), it would find that Defendants all have qualified immunity as to Plaintiff's Section 1983 claim and public official immunity for her state law claims. When, as here, a law enforcement officer is sued in his individual capacity, he is "entitled to invoke qualified immunity, which is ... immunity from suit itself." *Cooper v. Sheehan*, 735 F.3d 153, 158 (4th Cir. 2013). "Qualified immunity protects officers who commit constitutional violations but who, in light of clearly established law, could reasonably believe that their actions were lawful." *Knibbs v. Momphard*, 30 F.4th 200, 214 (4th Cir. 2022) (quoting *Henry v. Purnell*, 652 F.3d 524, 531 (4th Cir. 2011)). The doctrine balances two important values— "the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from

---

[6] Indeed, a finding of probable cause here is also supported by the state magistrate's decision that probable cause existed for Plaintiff's arrest without a warrant. *See* Doc. No. 16-6; *Johnson v. City of Greenville*, No. 4:15-cv-00064-BR, 2015 WL 7854564, at *7 (E.D.N.C. Dec. 3, 2015).

13

harassment, distraction, and liability when they perform their duties reasonably." *Pearson*, 555

U.S. at 231.

> The Fourth Circuit has stated:
>
> The basic rules of § 1983 [qualified] immunity are well known. Underlying the doctrine is a desire to avoid overdeterrence of energetic law enforcement by subjecting governmental actors to a high risk of liability. The concerns behind the immunity defense are especially salient in the context of street-level police work, which frequently requires quick and decisive action in the face of volatile and changing circumstances. The law thus shields police officers from civil liability unless the officer reasonably should have known that his actions violated clearly established constitutional rights.

*Rowland v. Perry*, 41 F.3d 167, 172 (4th Cir. 1994) (citations omitted) (emphasis added); *see also*

*Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).

In carrying out the qualified immunity analysis, a court's "first task is to identify the

specific right that the plaintiff asserts was infringed by the challenged conduct." *Winfield v. Bass*,

106 F.3d 525, 530 (4th Cir. 1997) (en banc). The court then engages in a two-step inquiry, asking

"whether a constitutional violation occurred" and "whether the right violated was clearly

established" at the time of the official's conduct. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009);

*Melgar ex rel. Melgar v. Greene*, 593 F.3d 348, 353 (4th Cir. 2010). Courts have discretion to

take these steps in either order.

As discussed above, the Court finds that a constitutional violation did not occur so it need

only further address the second alternate question. A right is "clearly established" if "the contours

of the right [are] sufficiently clear that a reasonable officer would understand that what he is doing

14

violates that right." *Hill v. Crum*, 727 F.3d 312, 321 (4th Cir. 2013) (quoting *Wilson v. Layne*, 526 U.S. 603, 615 (1999)). The inquiry into whether a right is clearly established must "be undertaken in light of the specific context of the case" and "not as a broad general proposition." *Saucier v. Katz*, 533 U.S. 194, 195 (2001). As the Fourth Circuit has explained:

> It is not required, however, that a court previously found the specific conduct at issue to have violated an individual's rights. The unlawfulness of the officer's conduct need only be manifestly apparent from broader applications of the constitutional premise in question. Put differently, a right may be clearly established if a general constitutional rule already identified in the decisional law applies with obvious clarity to the specific conduct in question.

*E.W. by & through T.W. v. Dolgos*, 884 F.3d 172, 185 (4th Cir. 2018); *A.G. v. Fattaleh*, No. 520CV00165KDBDCK, 2022 WL 2758607, at *8–9 (W.D.N.C. July 14, 2022).

With respect to her claims of false arrest, Plaintiff has not offered nor has the Court found any authority that would clearly establish that a reasonable officer would have known that there was no probable cause to arrest Ms. Main under the facts alleged.[7] To the contrary, as discussed above, there is no dispute that Plaintiff deliberately led the officers on a 10-15 minute chase, refusing to stop (or stay stopped) even though the officers had their lights and sirens on. Therefore, Defendants are entitled to summary judgement based on qualified immunity for Plaintiff's Section 1983 claims based on "false arrest."

---

[7] Plaintiff's only conclusory argument on this point is to state (at the highest level of generality) that "the constitutional law regarding probable cause for arrest under the Fourth Amendment is clearly established." Doc. No. 21 at 16.

15

Similarly, Defendants are entitled to summary judgment based on public official immunity for Plaintiff's state law claims of malicious prosecution and false imprisonment / actual imprisonment. Under North Carolina law, "a public official, engaged in the performance of governmental duties involving the exercise of judgment and discretion, may not be held personally liable for mere negligence in respect thereto." *Smith v. State*, 289 N.C. 303, 331, 222 S.E.2d 412 (1976) (quoting *Smith v. Hefner*, 235 N.C. 1, 7, 68 S.E.2d 783 (1952)). This immunity has been recognized at common law for over a century. *See Epps*, 122 N.C. App. at 202, 468 S.E.2d 846. North Carolina courts have deemed police officers engaged in performance of their duties as public officials for the purposes of public official immunity. *Campbell v. Anderson*, 156 N.C. App. 371, 376, 576 S.E.2d 726 (2003).

However, public official immunity is not absolute. Public officials' actions are not shielded if their actions were "(1) outside the scope of official authority, (2) done with malice, or (3) corrupt." *Wilcox*, 222 N.C. App. at 288, 730 S.E.2d 226. An individual acts with malice when he "wantonly does that which a man of reasonable intelligence would know to be contrary to his duty and which he intends to be prejudicial or injurious to another." *Evans v. Croft*, 265 N.C. App. 601, 827 S.E.2d 342 (2019). There is no credible allegation that the Officers acted outside the scope of their authority[8] or corruptly; therefore, whether the Officers are entitled to public official immunity turns on whether they acted with malice.

---

[8] Plaintiff in fact alleges in the Complaint that Defendants acted "within the scope of their employment." *See, e.g.*, Doc. No. 1 at ¶¶ 6, 114.

16

The Court finds there is no evidence that indicates the officers acted with malice in arresting Ms. Main. While Plaintiff argues – again in conclusory fashion – that Defendants "acted maliciously and corruptly, as they failed to act competently, regarding their welfare check of Main" and their actions were "done needlessly, manifesting a reckless indifference" to her rights, Plaintiff fails to specify any *facts* that might establish malice. Further, the Court has reviewed the video evidence Plaintiff presented, and the Court has observed no behavior by the officers that can reasonably be found to be evidence of malice in deciding to arrest her. Therefore, the Defendants are entitled to public official immunity with respect to Plaintiff's state law claims based on an alleged false arrest.

## C.     Excessive Force

The remaining portion of Plaintiff's Section 1983 claim and her state law claims of intentional infliction of emotional distress, negligent infliction of emotional distress, assault and battery all depend on her allegations that Defendants used "excessive force" to arrest her in violation of the Fourth Amendment. The Fourth Amendment prohibits police officers from using force that is "excessive" or not "reasonable" in the course of making an arrest. *Graham v. Connor*, 490 U.S. 386, 388 (1989); *Meyers v. Baltimore Cnty., Md.*, 713 F. 3d 723 (4th Cir. 2013). Whether an officer has used excessive force to effect an arrest is based on "objective reasonableness," taking into account "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396, 399.

17

Objective reasonableness is the touchstone; even "[a]n officer's evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force; nor will an officer's good intentions make an objectively unreasonable use of force constitutional." *Graham*, 490 U.S. at 397; *see also Stanton v. Elliott*, 25 F.4th 227, 233 (4th Cir. 2022) ("Whether an officer has used excessive force is judged by a standard of objective reasonableness.") (citation omitted). However, "[i]n questioning the split-second decisions of police officers, [the Court] must avoid hindsight bias and try to place ourselves in the heat of the moment." *Stanton*, 25 F.4th at 233. Thus, to determine whether Plaintiff's claims can proceed, the Court must ask whether the officers' use of force was objectively reasonable in light of the facts and circumstances confronting them, viewed in the light most favorable to the Plaintiff, without regard to the officers' underlying intent or motivation. *Knibbs v. Momphard*, 30 F.4th 200, 214 (4th Cir. 2022). The Court must focus on "the totality of the circumstances" based on the "information available to the Officers 'immediately prior to and at the very moment [they used force to arrest the Plaintiff].'" *Id.*

First, in considering the circumstances here, the Supreme Court has stated that "[i]f an officer has probable cause to believe that an individual has committed even a very minor criminal offense in his presence, he may, without violating the Fourth Amendment, arrest the offender." *Atwater v. City of Lago Vista*, 532 U.S. 318, 354 (2001). In *Atwater*, the arrestee committed a seat belt violation punishable only by a fine. Nonetheless, the Supreme Court held that the Fourth Amendment does not forbid a warrantless arrest for such a minor violation. *Id.*; *see Pegg v.*

18

*Herrnberger*, 845 F.3d 112, 118 (4th Cir. 2017) (holding that force used in arresting (and taking to the ground) a driver after a traffic stop was not excessive).

With respect to the *Graham* factors, the key distinguishing factor in this case is "whether the suspect posed an immediate threat to the safety of the officers or others."[9]  At the time the officers arrested Plaintiff they undisputedly knew or believed the following: 1) they were confronting a person who had minutes earlier threatened suicide and was likely to be unstable and agitated; 2) Ms. Main had access to a loaded handgun; and 3) Plaintiff made no immediate effort to leave her vehicle after being told to do so. Under such circumstances, it was objectively reasonable for the Officers to conclude – in the literal few seconds they had to make a decision whether to use force to remove Plaintiff from the car – that Plaintiff posed an immediate threat to her own and their safety.  *See Anderson v. Russell*, 247 F.3d 125 (4th Cir. 2001); *Slattery v. Rizzo*, 939 F.2d 213 (4th Cir. 1991).  Further, it appears from the video that the officers used only the force necessary to remove Plaintiff from the car, place her in handcuffs and take her to one of the officer's patrol cars.

---

[9] With respect to the first and third *Graham* issues, the parties' different factual allegations / characterizations make it difficult to clearly find in favor of either side. For "the severity of the crime at issue," on the one hand, Ms. Main had at most committed traffic offenses in fleeing the officers attempt to assist her. On the other, Defendants suggest the Court look at the "severity" of the offense as a proxy for whether Plaintiff was "dangerous," which is supported by her mental state and possession of a weapon. And, with respect to whether Plaintiff was "actively resisting" the parties simply disagree on that point, which the Court cannot (and need not) definitively resolve.

19

Plaintiff faults the officers for mishandling her "wellness" check and not attempting to deescalate the situation. She wishfully envisions an alternative scenario in which the officers approached the volatile situation "calmly" and somehow reasoned with her not to hurt herself or others. Even if that had been possible – and her statement to the officers that she wished she had "gone ahead and done it" suggests the difficulty of achieving an entirely peaceful solution – it is not the Court's role to determine if the arrest could have ended differently. Neither "best practices" nor perfect outcomes are constitutionally mandated. Yes, the officers' "wellness check" call could have turned out better, but it also could have turned out far worse. For example, had the officers remained close to their cars and tried to verbally defuse the situation, could a physical interaction between Plaintiff and the officers possibly been avoided altogether? Yes, but it could have also ended tragically with Ms. Main using the extra time to simply reach into the passenger seat and use her husband's gun to harm herself or the officers. *See Craven v. Novelli*, 661 F. Supp. 3d 430, 438 (W.D.N.C. 2023) (suicide hotline caller killed when he came out of his house with a gun).

So, the Court must consider the circumstances and the range of outcomes as they occurred and make a judgment only on the limited legal question of "objective reasonableness" presented. Again, based on the authority of *Pegg* (in which the driver did not even have a weapon) and the other reasons stated above, the Court concludes that no jury could reasonably find that the officers' conduct was objectively unreasonable. Therefore, the officers did not use excessive force in violation of the Fourth Amendment in arresting the Plaintiff.

20

In addition to her Section 1983 claims, Plaintiff has asserted numerous claims under North Carolina state law based on her allegations of excessive force, including intentional and negligent infliction of emotional distress and assault and battery. The Fourth Circuit has recognized that, "the jurisprudence governing Fourth Amendment excessive force actions also controls a party's actions for battery and gross negligence." *Njang v. Montgomery Cnty., Maryland*, 279 F. App'x 209, 216 (4th Cir. 2008); *Sigman v. Town of Chapel Hill*, 161 F.3d 782, 789 (4th Cir. 1998); *Knight Estate of Graham v. City of Fayetteville,* 234 F. Supp. 669, 692 (E.D.N.C. 2017). Therefore, state law tort claims that are premised on an officer's reasonable, non-excessive use of force are not actionable under North Carolina law. *Glenn-Robinson v. Acker*, 140 N.C. App. 606, 625 (2000); *Todd v. Creech*, 23 N.C. App. 537, 209 S.E.2d 293 (1974); *Bell v. Dawson,* 144 F. Supp.2d 454, 464 (W.D.N.C. 2001); *Wilcoxson v. Painter*, 2016 WL 866327, *10 (E.D.N.C. March 3, 2016) ("[w]here a law enforcement officer's use of force was reasonable for the purposes of finding qualified immunity to a § 1983 excessive force claim, it is fatal to the Plaintiff's state law tort claims."). Accordingly, for the same reasons that the Court finds that the Defendants are entitled to summary judgment on Plaintiff's Federal law claim, they are also entitled to summary judgment on Plaintiff's related state law claims.

Moreover, as discussed above in connection with Plaintiff's false arrest claims, the Defendants are entitled to qualified and public official immunity for Plaintiff's claims based on excessive force. Plaintiff has suggested no authority which "clearly establishes" that the officers' conduct was excessive (indeed, *Pegg* is very much to the contrary) nor has she presented evidence

that could reasonably support a finding that the officers acted with malice against Plaintiff. Therefore, Defendants are entitled to qualified and public official immunity for Plaintiff's excessive force claims.

## IV.    ORDER

**NOW THEREFORE IT IS ORDERED THAT:**

1.  Defendants' Motion for Summary Judgment (Doc. No. 15) is **GRANTED**; and

2.  The Clerk is directed to close this matter in accordance with this Order.

**SO ORDERED ADJUDGED AND DECREED**.

Signed: February 29, 2024

Kenneth D. Bell
United States District Judge

22